**Daniel S. ALCORN, Plaintiff,**

v.

**Gregory D. WOLFE, Defendant.**

**Civ. A. No. 93–1056 (JHG).**

United States District Court,
District of Columbia.

July 16, 1993.

---

48

Robert Lester Weinberg, Williams & Connelly, Washington, DC, for Daniel S. Alcorn.

William Thaddeus Coleman, Jr., Donald Tiffany Bliss, Jr., Debra A. Valentine, Baker & Botts, Washington, DC, for Gregory D. Wolfe.

Gregory Elias Lucyk, Roger C. Wiley, Office of the Atty. Gen., of Virginia Richmond, VA, for L. Douglas Wilder.

## MEMORANDUM OPINION

JOYCE HENS GREEN, District Judge.

Plaintiff Daniel S. Alcorn ("Alcorn"), appointed to the Board of Directors of the Metropolitan Washington Airports Authority ("MWAA") by Governor L. Douglas Wilder ("Wilder" or "the Governor") on November 28, 1990, commenced this suit against Gregory D. Wolfe ("Wolfe"), Secretary of the MWAA, on May 27, 1993. Plaintiff seeks a judgment declaring, *inter alia*, that he remains a *bona fide* member in good standing of the MWAA and its Board of Directors. The plaintiff also seeks a permanent injunction barring the defendant from denying his enjoyment of the rights and privileges of a *bona fide* member in good standing of the MWAA and its Board of Directors.

Upon consideration of all filings by Alcorn, Wolfe, and Wilder, who has participated in this case as an intervenor-defendant, and upon consideration of evidence and arguments presented at trial, a declaratory judgment is entered in favor of plaintiff and against defendant and intervenor-defendant. Plaintiff's request for injunctive relief is denied.

## FINDINGS OF FACT

In 1984, United States Secretary of Transportation Elizabeth Dole formed an advisory commission to explore transferring control of National Airport ("National") and Dulles International Airport ("Dulles"), both owned by the federal government, to a regional authority. The Secretary considered that such a transfer would enable the financing of necessary capital improvements for the airports through the issuance of tax-exempt bonds. The advisory body, sometimes referred to as the Holton Commission, recommended the creation of an authority and suggested that it be established by a congressionally approved compact between Virginia and the District of Columbia. The Commission further recom-

mended that the authority be governed by a Board of Directors comprised of eleven members serving staggered six-year terms, five members to be appointed by the Governor of Virginia, three by the Mayor of the District of Columbia, two by the Governor of Maryland, and one by the President of the United States with the advice and consent of the United States Senate.

In 1985, the Commonwealth of Virginia and the District of Columbia legislatures enacted enabling legislation authorizing the creation of the recommended regional airports authority and the lease of National and Dulles from the United States to the authority. 1985 Va. Acts, ch. 598; 1985 D.C. Law 6–67. The Virginia enabling act provided, *inter alia,* that members appointed by the Governor of the Commonwealth "shall be subject to confirmation by the Virginia General Assembly." 1985 Va. Acts, ch. 598 § 4(A). Likewise, the District of Columbia enabling act required that members appointed by the Mayor are "subject to confirmation by the Council of the District of Columbia." 1985 D.C. Law 6–67, § 5. Under both acts, all appointments, except for the initial appointments, must be for six-year terms. 1985 Va. Acts, ch. 598 § 4(C); 1985 D.C. Law 6–67, § 5(c).

In 1986, Congress authorized the transfer, by long-term lease, of the operating authority to the MWAA. Metropolitan Washington Airports Act of 1986 ("Transfer Act"), codified at 49 U.S.C.App. §§ 2451–2461. The Transfer Act provided that the MWAA "shall be ... independent of the Commonwealth of Virginia and its local governments, the District of Columbia, and the Federal Government." 49 U.S.C.App. § 2456(b)(1). It was strongly believed that an independent authority was necessary, *inter alia,* to avoid negative influence on contracting processes, to facilitate necessary though unpopular decisions relating to the airports, and to ensure the protection of revenue generated by the airports. Testimony of Gregory D. Wolfe, Transcript of June 28, 1993 Trial ("Tr.") at 41. Like the terms of the enabling acts, the Transfer Act required members of the MWAA to be appointed for staggered six-year terms. 49 U.S.C.App. § 2456(e)(3).

Terms of that length were prescribed to help guarantee the independence of the MWAA and to ensure a certain level of experience and expertise. Testimony of Gregory D. Wolfe, Tr. at 42.

On March 2, 1987, the United States, acting by and through the Secretary of Transportation, and the MWAA, by the Chairman of its Board of Directors, entered into a fifty-year lease of National and Dulles. Following execution of the lease, Virginia and the District of Columbia amended their enabling acts to conform with the Transfer Act. Among other sections added to the Virginia statute was the following provision:

> Pursuant to Section 6007(b) of the Metropolitan Washington Airports Act of 1986, the Authority is established solely to operate and improve both metropolitan Washington airports as primary airports serving the metropolitan Washington area and shall be independent of the Commonwealth and its local political subdivisions, the District of Columbia and the federal government in the performance and exercise of the airport-related duties and powers enumerated in subdivisions 1 through 16 of subsection A of this section. Any conflict between the exercise of these enumerated powers by the Authority and the powers of any local political subdivision within which Authority Facilities are situated shall be resolved in favor of the Authority.

1987 Va. Acts, ch. 665 § 5(B).

On November 28, 1990, intervenor-defendant Wilder appointed Alcorn as a member of the MWAA. The certificate evidencing the appointment was signed by the Governor and the Secretary of the Commonwealth and stated:

> Know Ye that from special trust and confidence reposed in his fidelity, our Governor by virtue of authority vested in him by law, hath appointed and hereby commissions Daniel S. Alcorn a member of the Metropolitan Washington Airports Authority, effective November 24, 1990, to serve for a term of six years, ending November 23, 1996.

Plaintiff's Exhibits 1, 1A. Although the Virginia enabling act required the Governor's appointees to the MWAA to be confirmed by

the Virginia General Assembly, the names of Alcorn and Gerald Lee, another appointee commissioned at the same time, were never forwarded for confirmation.

The person responsible for the clerical task of forwarding names to the General Assembly for confirmation was Sheila Evans, who has served in the Secretary of the Commonwealth's Office as the conflict of interest and appointments specialist since August 1990. At trial and in an affidavit attached to the intervenor-defendant's June 23, 1993 motion to amend his answer, Ms. Evans stated that she was told by her predecessor that interstate compact appointees such as Alcorn did not need to be confirmed by the General Assembly. Evans Affidavit at ¶ 5; Tr. at 102. Ms. Evans also testified that she asked research assistants compiling information about appointees to indicate in writing whether each appointee had to be confirmed. The research assistant in charge of the appointments of Alcorn and Lee wrote on their corresponding forms "Not Confirmed," which Evans interpreted to mean that their commissions did not require confirmation. Tr. at 104. Ms. Evans stated that it was her decision alone not to refer the names of the MWAA appointees to the General Assembly for confirmation, Tr. at 101, Evans Affidavit at ¶ 6, and there is no evidence in the record to support a finding that her decision was anything but an innocent mistake.

Curiously, although Alcorn and Lee's names had never been submitted for confirmation, the Secretary of the Commonwealth issued "Certificates as to Appointment and Incumbency of Directors" on March 19, 1991 and April 8, 1992 which represented that Alcorn and Lee had been confirmed. Plaintiff's Exhibits 2 and 3. The certificates were prepared by outside bond counsel for the MWAA and, under the "preferred" method of issuance, should have been reviewed by Sheila Evans before they were sent to the Secretary of the Commonwealth for her signature. Testimony of Penelope S. Anderson, Tr. at 69, 67. Ms. Evans has represented, however, that she does not remember seeing the 1991 and 1992 certificates, Evans Affidavit at ¶ 7, and it is unclear why the Secretary of the Commonwealth mistakenly concluded that Alcorn and Lee had been confirmed.

After taking his oath of office, Alcorn invested much time familiarizing himself with matters concerning the MWAA. He studied the statutory framework of the MWAA, previous annual reports, and other background documentation. He also reviewed the substantive operations of the MWAA, including a two billion dollar capital development program for the airports and lease arrangements with the United States Department of Transportation and airlines using the airports. Alcorn regularly participated in the monthly meetings of the MWAA Board and attended numerous workshops to study ongoing activities of the airports. At trial, Alcorn testified, "I find that hardly a workday goes by that I do not spend time on Authority business." Tr. at 14. In accordance with the terms of the compact, Alcorn has not received compensation for his work as a member of the MWAA.

While serving on the Board of the MWAA, Alcorn had several politically-related differences with the Governor. The first concerned the 1992 election of a Chairman of the Board by MWAA members. Governor Wilder, through a representative, asked Alcorn to support the candidacy of a newly appointed member who had previously served as the Governor's Deputy Chief of Staff. Alcorn refused to do so, based on his belief that the candidate lacked the requisite MWAA experience. The second dispute concerned a proposal supported by Governor Wilder to move the Washington Redskins to a new stadium in Alexandria, Virginia near National Airport. Alcorn insisted that the proposal not go forward until the MWAA investigated whether increased traffic caused by a new stadium would adversely affect the operations of National. The third matter concerned a statement made publicly by Alcorn and printed in the press in March 1993 that many people involved in Virginia Democratic politics were disturbed by the deteriorating relationship between Governor Wilder and United States Senator Charles Robb. Alcorn later learned that the Governor "did not agree with [his] perspective" on the Wilder-Robb relationship. Tr. at 30.

In early March 1993, outside bond counsel submitted another certificate of incumbency stating that all of Governor Wilder's appointees to the MWAA had been confirmed by the General Assembly. Sheila Evans reviewed the document and recognized that it was incorrect. She brought the matter to the attention of Penelope Anderson, the Deputy Secretary of the Commonwealth, who informed the staff counsel to the Governor that none of the Governor's appointees to the MWAA, including Alcorn, had ever been referred for confirmation.

On March 16, 1993, Jean Mundy, an employee working in the Secretary of the Commonwealth's Office, telephoned Alcorn to inform him that the Office had recently become aware that he and the other MWAA members appointed by the Governor—Lee, William Porter, who was appointed to fill the vacancy created when Lee accepted a judicial appointment, and Randal Kell—should have been referred to the General Assembly for confirmation but were not. Mundy told Alcorn that the matter would be resolved by the General Assembly when they convened for a one-day special session in April 1993, and she asked him to fill out a standard resume form to be sent to the General Assembly for consideration during the confirmation process. Mundy faxed the form to Alcorn on March 16, 1993 and he returned it the same date.

Sometime during the first week of April 1993, the Governor reappointed Porter and Kell and referred their names to a special session of the General Assembly for confirmation. Kell and Porter were confirmed on April 7, 1993. On April 19, 1993, the Governor issued a press release informing the public that he had appointed James M. DeFrancia to the position held by Alcorn. The release stated, "DeFrancia succeeds Daniel S. Alcorn who has temporarily held the board position since November 24, 1990." Plaintiff's Exhibit 5. Alcorn learned of the new appointment the following day. DeFrancia took an oath of office on April 28, 1993 and the Governor plans to submit his name for confirmation during the 1994 session of the General Assembly. The Governor has not contradicted Alcorn's accusation that the de-

cision not to reappoint Alcorn was motivated by the three political disputes between them; indeed, the Governor has failed to proffer any reason for his refusal to reappoint the plaintiff. Based on the undisputed record, it is evident that the Governor did not recommission Alcorn because of the cited political differences.

On May 5, 1993, both DeFrancia and Alcorn attended the monthly meeting of the MWAA's Board but agreed to abstain from voting at that time. By letter dated May 20, 1993 counsel to the Board of Directors, also serving as counsel to defendant in this case, advised the Chairman:

> Since [the validity of the DeFrancia appointment] is an issue of first impression under the compact and Virginia law and since existing law and precedent do not establish unequivocally who would prevail in a court of law, it is our further recommendation that the Airports Authority not recognize the votes or participation of either Mr. Alcorn or Mr. DeFrancia as members of the Board until such time as the parties lawfully resolve the controversy between themselves or the legal issue is determined by a court of law. Controversies of this type are properly resolved by the affected parties usually by resort to the courts.

Plaintiff's Exhibit 6 at 3–4. By letter dated May 26, 1993, the Chairman informed Alcorn that he was accepting counsel's advice and would recognize neither Alcorn nor DeFrancia as a voting member of the MWAA until the dispute is resolved.

Alcorn commenced this action on May 27, 1993, naming only the Secretary of the MWAA, Gregory D. Wolfe, as a defendant. On June 7, 1993, Wolfe filed a motion to join DeFrancia as a defendant, claiming that were DeFrancia not joined, he would be subject to a substantial risk of incurring another lawsuit and potentially inconsistent obligations. At plaintiff's request, a status conference was held on June 8, 1993 and the Court placed this case on an expedited schedule. Plaintiff filed an opposition to defendant's motion for joinder on June 9, 1993. Governor Wilder filed a motion to intervene as a defendant on June 14, which was grant-

ed on June 21. In light of the entry of the intervenor, the defendant withdrew his motion to join DeFrancia. The final hearing was held on June 28, 1993.

**CONCLUSIONS OF LAW**

The Governor relies on the Virginia enabling act's confirmation requirement and Article V, § 7 of the Virginia Constitution as the sources of his authority to appoint DeFrancia to the seat held by Alcorn. Article V, § 7 states in relevant part:

The Governor shall have power to fill vacancies in all offices of the Commonwealth for the filling of which the Constitution and laws make no other provision....

Gubernatorial appointments to fill vacancies in offices which are filled by election by the General Assembly or by appointment by the Governor which is subject to confirmation by the Senate or the General Assembly, made during the recess of the General Assembly, shall expire at the end of thirty days after the commencement of the next session of the General Assembly.

According to the Governor, because 1985 Va. Acts, ch. 598 § 4(A) provides that "Members representing the Commonwealth of Virginia shall be subject to confirmation by the Virginia Assembly," and because Alcorn was never confirmed by the General Assembly, Alcorn's November 28, 1990 appointment expired in early 1991 and Alcorn served merely in a *de facto* capacity from the time of expiration until DeFrancia took his oath of office approximately two and one-half years later. Alcorn disagrees with Wilder that § 7 applies to his appointment, contending that the term "offices" in the last sentence of the provision refers to "offices of the Commonwealth" as that phrase is used in the preceding paragraph and that members of the MWAA, an independent authority, cannot be considered to hold Virginia offices. Alcorn posits that if any provision of the Virginia Constitution applies to his appointment, it should be Article V, § 11, which states:

No person appointed to any office by the Governor, whose appointment is subject to confirmation by the General Assembly, under the provisions of this Constitution or any statute, shall enter upon, or continue in, office after the General Assembly shall have refused to confirm his appointment, nor shall such person be eligible for reappointment during the recess of the General Assembly to fill the vacancy caused by such refusal to confirm.

Because the General Assembly has not voted against his confirmation, Alcorn contends that he is still a valid member of the MWAA. In the alternative, Alcorn argues that in the event § 7 is interpreted to apply to this case, that provision is preempted by the terms of the compact and the federal Transfer Act.

Whether or not the language of Article V, § 7 should be interpreted to apply to offices created by a congressionally approved compact is a difficult issue of first impression, and the intervenor has requested that the question be referred to the Virginia Supreme Court for resolution. Because Article V, § 7 would be preempted by the terms of the compact creating the MWAA even if it were interpreted to apply to Alcorn's appointment, however, the issue need not be determined by this or any other Court for purposes of resolving this case.

Under the Compact Clause of the United States Constitution, "No State shall, without the Consent of Congress, ... enter into any Agreement or Compact with another State...." Art. I, § 10, cl. 3. Because the compact creating the MWAA was congressionally sanctioned in accordance with the Compact Clause, it is a federal law subject to federal construction, notwithstanding its genesis in the enabling acts of Virginia and the District of Columbia. *See Carchman v. Nash,* 473 U.S. 716, 719, 105 S.Ct. 3401, 3403, 87 L.Ed.2d 516 (1985); *Cuyler v. Adams,* 449 U.S. 433, 438, 101 S.Ct. 703, 706–07, 66 L.Ed.2d 641 (1981). In light of the Supremacy Clause to the United States Constitution, Art. VI, cl. 2, and because compacts are analogous to contracts between states, *see Texas v. New Mexico,* 482 U.S. 124, 128, 107 S.Ct. 2279, 2283–84, 96 L.Ed.2d 105 (1987), the terms of the MWAA compact cannot be modified unilaterally by state legislation and take precedence over conflicting state law. *See McComb v. Wambaugh,* 934 F.2d 474, 479 (3rd Cir.1991); *Kansas City Area*

*Transp. Auth. v. State of Missouri,* 640 F.2d 173, 174 (8th Cir.1981).

Assuming *arguendo* that Article V, § 7 of the Virginia Constitution can be interpreted to address appointments made by the Governor to the MWAA, application of that section to the circumstances of this case would clearly conflict with two provisions of the MWAA compact: namely, the provision expressly mandating the MWAA's independence from Virginia, its local subdivisions, the District of Columbia, and the federal government, and the provision requiring appointments to be for six-year terms. There can be no doubt that the independence of the MWAA from political influence is of critical importance. The legislation enacted by the United States, Virginia, and the District of Columbia make that point clear, *see* 49 U.S.C.App. § 2456(b) ("The Airports Authority shall be—(1) independent of the Commonwealth of Virginia and its local governments, the District of Columbia, and the Federal Government...."); 1987 Va. Acts, ch. 665 § 5(B) (same); D.C.Code § 7–1506(b) (same), as does the testimony of defendant Wolfe, who has been intimately involved with the MWAA since he served as the executive director of the Holton Commission. By attempting to replace Alcorn with DeFrancia based on his purported authority under § 7 and because of disputes concerning an election of the MWAA's Chairman of the Board, the possible effects of a new Redskins stadium on the operations of National Airport, and intra-party rivalries, Governor Wilder has attempted to inject his political influence into the operations of the MWAA. Such action significantly jeopardizes the independence of the MWAA and clearly frustrates one of the most important objectives of the compact.

The Governor's attempt to use § 7 to replace Alcorn also clashes with the compact provision requiring that members of the MWAA serve in staggered six-year terms. 49 U.S.C.App. § 2456(e)(3); 1987 Va. Acts, ch. 665 § 4(C); D.C.Code § 7–1506(f)(2). That requirement is significant to secure the independence of the MWAA and to ensure

that its members possess a certain level of experience and expertise. By contending that § 7 authorizes him to interrupt the tenure of Alcorn, Wilder seeks in effect to transform Alcorn's commission into an appointment at will. Were § 7 allowed to operate in that manner, both goals of the six-year term requirement would be thwarted; the MWAA would be deprived of the substantial knowledge and experience Alcorn has obtained while serving on the Board, and the MWAA's insulation from outside political influence would be substantially reduced.

Accordingly, because Article V, § 7 of the Virginia Constitution as applied to Alcorn's appointment would be inconsistent with the terms and purposes of two separate provisions of the MWAA compact, 49 U.S.C.App. § 2456(b); 1987 Va. Acts, ch. 665 § 5(B); D.C.Code § 7–1506(b); and 49 U.S.C.App. § 2456(e)(3); 1985 Va. Acts, ch. 598 § 4; D.C.Code § 7–1506(e)(3); § 7 is held to be preempted under the Supremacy Clause and caselaw governing the construction of interstate compacts.

## CONCLUSION

For the reasons stated above, the Court concludes that Daniel S. Alcorn's appointment to the MWAA did not lapse for lack of confirmation and that Governor Wilder's attempt to appoint James DeFrancia to the seat held by Alcorn had no legal effect. A declaratory judgment will be entered, on the accompanying Judgment page, in favor of the plaintiff and against the defendant and the intervenor-defendant stating that the plaintiff remains a *bona fide* member of the MWAA and its Board of Directors and retains all the rights and privileges of such position. Although the plaintiff has also requested injunctive relief, the defendant has stated that an injunction would be unduly burdensome [1] and has guaranteed that he will abide by whatever declaratory judgment this Court issues. Because an injunction would likely be burdensome, and because defendant's unequivocal guarantee makes an

---

1. For example, the defendant has represented that an injunction could excessively constrain

him if Alcorn were to resign, move out of the Metropolitan area, or be elected to public office.

injunction unnecessary, plaintiff's request for injunctive relief is denied.

IT IS SO ORDERED.

### *JUDGMENT*

For the reasons stated in the accompanying Memorandum Opinion, judgment is hereby entered in favor of plaintiff Daniel S. Alcorn and against defendant Gregory D. Wolfe, Secretary of the Metropolitan Washington Airports Authority, and intervenor-defendant L. Douglas Wilder, Governor of the Commonwealth of Virginia. For the duration of his term ending November 23, 1996, the plaintiff remains a *bona fide* Member of the Metropolitan Washington Airports Authority and its Board of Directors and retains all the rights and privileges of such position, including but not limited to the right to vote at meetings of the Board of Directors and to have his vote duly recorded.